# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA

vs.                                        Case No.: 8:22-CR-120-WFJ-TGW

JOSEPH ABDO

_____/

## DEFENDANT JOSEPH ABDO'S SENTENCING MEMORANDUM

Defendant Joseph Abdo, by and through his undersigned counsel, submits this memorandum in advance of the August 18, 2023 sentencing hearing.

## DEFENDANT'S PERSONAL BACKGROUND

Joe Abdo is a 41 year old husband and father of four girls who has operated a commercial fishing business since 2009. PSI paras. 57, 65, 83. His daughters are Layla (14), Grace (11), Evangelina (9), and Vienna (5). PSI para. 65. His wife Ashley, who describes herself as Mr. Abdo's soulmate, is a homemaker who also helps Layla with her home schooling.[1] PSI para. 65. Mr. Abdo's life is centered around his family and his business.

---

[1] A video interview of Ashley Abdo will be submitted to the Court and Government counsel prior to sentencing.

Mr. Abdo's business operates three older fishing boats in the Gulf of Mexico.[2] PSI para. 83. He sells his catch to local buyers, who in turn sell fish primarily to local restaurants. Mr. Abdo maintains and equips these boats and supervises his boat captains and their crews. *Id.*

Mr. Abdo's chaotic and abusive childhood is described in detail in paragraphs 59-64 of the PSI report.

As a result of the multiple and repeated traumas he suffered growing up, Mr. Abdo has been treated by therapists intermittently since 2010. PSI para. 73. In 2012, Mr. Abdo began being treated by LCSW Erin Grupp, who still treats him. *Id.* According to Ms. Grupp's declaration attached as **Exhibit 1**, Mr. Abdo suffers from Post Traumatic Stress Disorder (PTSD), Panic Disorder, and Attention-Deficit Hyperactivity Disorder (ADHD). Ms. Grupp's professional opinion is that these disorders, particularly PTSD, "are the result of his very traumatic childhood."

## NO TWO LEVEL STAFFORD ACT ENHANCEMENT SHOULD BE APPLIED UNDER U.S.S.G § 2B1.1(b)(12)

A. Introduction

The two-level enhancement under U.S.S.G. § 2B1.1(b)(12) should not be applied here. That enhancement applies "[i]f the offense involved conduct described in 18 U.S.C. § 1040 ..." 18 U.S.C. § 1040 in turn punishes fraud and

---

[2] A video describing Mr. Abdo's business will be submitted to the Court and Government counsel prior to sentencing.

false statements "in any matter involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with a major disaster declaration under section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. § 5170) or an emergency declaration under section 501 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. § 5191) ...." "To state an offense under 18 U.S.C. § 1040, the government must allege and prove that (1) defendant made a materially false or fraudulent statement or representation ...; (2) defendant's statement was in connection with a benefit; (3) the benefit was in connection with the Disaster Declaration; and (4) the benefit was a payment, money, or thing of value of the United States." *United States v. Lightfoot*, 2018 WL 4376509, *1 (W.D. La., August 30, 2018), citing *United States v. Olsen*, 760 F.3d 825, 827-28 (8th Cir. 2014).

### B. The Limited Scope of President Trump's COVID Emergency Declaration

On March 13, 2020, President Trump sent the letter attached as **Exhibit 2** stating that the COVID-19 pandemic "is of sufficient severity and magnitude to warrant an emergency declaration under section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act ...." However, the only "benefits" authorized by President Trump's Stafford Act declaration was assistance provided by **the Federal Emergency Management Agency** (not

3

the Small Business Administration) "for emergency protective measures not authorized under other federal statutes." **Exhibit 2 at 2.** As noted in the Congressional Research Service report dated March 13, 2020, attached as **Exhibit 3,** "[t]he Stafford Act emergency declaration for COVID-19 authorized only one form of assistance: PA [public assistance] emergency protective measures", which included "activation of State Emergency Operations Centers, National Guard costs, [and] law enforcement and other measures to protect public health and safety." **Exhibit 3 at 3.** "IA [Individual Assistance]", including FEMA's Individuals and Households Program, "was not authorized pursuant to the initial emergency declaration for COVID-19." *Id.* Accordingly, none of the three charged loans constitute benefits authorized or paid in connection with a Stafford Act declaration.

As explained in the Congressional Research Service report dated April 22, 2020 titled "Stafford Act Declarations for COVID-19 FAQ" attached as **Exhibit 4**, "[t]he assistance provided pursuant to an emergency declaration is limited." *Id.* at 3. "Specifically, the COVID-19 emergency declarations authorized PA [Public Assistance] Category B-Emergency Protective Measures" under which "[s]tates, territories, or tribes will be the PA grant Recipients and administer PA awards." *Id.* at 9. "Eligible applicants are to reimbursed 75 percent of eligible costs incurred while performing emergency

protective measures" such as Emergency Operations Center costs; emergency medical care; medical sheltering; household pet sheltering; purchase and distribution of food, water and ice; security and law enforcement costs; costs of search and rescue; and reimbursements to states, tribes and territories for overtime costs. *Id.* at 10-11.

Neither the Count One PPP loan nor the Count Two PPP loan are Stafford Act benefits. To the contrary, as stated in the Congressional Research Service report titled "SBA Paycheck Protection Program (PPP) Loan Forgiveness: In Brief" attached as **Exhibit 5,** the two charged PPP loans are benefits resulting from the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Public Law 116-136, not the Stafford Act. **Exhibit 5 summary page.**

C. The *Redfern* Case

The only reported PPP sentencing case considering this issue held that PPP benefits were not authorized "in connection with" a Stafford Act declaration. *United States v. Redfern,* 2023 WL 2823064, *3 (4th Cir., April 7, 2023) ("the district court concluded that EIDL benefits (though not PPP benefits) were authorized 'in connection with' a Stafford Act declaration").

In *Redfern,* "the parties and the court all essentially agreed on a narrow reading of section 1040 requiring a direct link to a Stafford Act declaration,

which excluded the defendants' PPP fraud" "because, as the district court said, Congress established the PPP in the CARES Act 'independently of a Stafford Act declaration.'" Government's Appeal Brief in *United States v. Redfern*, 2022 WL 13832482, *33, 40 (4th Cir., October 17, 2022).[3]

### D. Plain Meaning of "In Connection With"

According to the Eleventh Circuit, "the plain meaning of the phrase 'in connection with'" is "with reference to [or] concerning." *Hunstein v. Preferred Collection and Management Services, Inc.*, 994 F.3d 1341, 1349 (11th Cir. 2021) *vacated on other grounds*, 17 F.4th 1016 (11th Cir. 2021). Here, the Count One and Count Two PPP loans do not refer to or concern President Trump's COVID emergency declaration "because, as the [*Redfern*] court said, Congress established the PPP in the CARES act 'independently of a Stafford Act declaration.'" 2022 WL 13832482, *33.

---

[3] In contrast, the *Redfern* court held that EIDL loans, unlike PPP loans, were subject to the section 1040 enhancement because "Stafford Act declarations served as at least one source (and likely the key source) of legal authority for the EIDLs that Defendant sought to obtain by fraud." *Id.* at *42. That is because "[i]n section 1110(f) of the CARES Act … Congress amended the Small Business Act specifically to authorize EIDLs in the event of 'an emergency involving Federal primary responsibility determined to exist by the President under the section 501(b) of the Stafford Act.'" *Id.*, 134 Stat. at 308 (codified at 15 U.S.C. § 636(b)(2)(D).

6

E. Interpretation of Stafford Act Enhancement Under the Rule of Lenity

"The rule of lenity is a substantive canon of statutory construction 'requir[ing] courts to construe ambiguous criminal statutes narrowly in favor of the accused" which "applies to both statutes and the [Sentencing] Guidelines." *United States v. Quiroga,* 2022 WL 4295414, *2 (11th Cir., September 19, 2022) (unpublished and per curiam), *citing United States v. Jeter,* 329 F.3d 1229, 1230 (11th Cir. 2003).

The best evidence of the ambiguity of applying the Stafford Act enhancement to PPP loans, as in this case, are these multiple statements made by AUSA Dupre at the *Redfern* sentencing hearing:

> "Your Honor, I think you're exactly right that it's a little bit ambiguous. In my understanding of the Government's position is that because of that exact problem, that ambiguity, for lack of a better analogy, the tie goes to the runner; and so the Government has consistently been making the argument that it does not apply to defendants in these particular cases."

> "It's the Government's position that we are trying to be consistent, and throughout the country, the argument has been from the Government that 1040 doesn't apply outside of this outlier of *United States v. Lewis.*"

7

> "All I can tell the Court is that that is the position. Because of the ambiguity, they do not want to apply it …."
>
> "But the Government, as its entity, it's trying to maintain a level of consistency throughout the United States so that I'm not arguing here that it doesn't apply and somebody else is arguing it does apply. So that's the position."

*United States v. David Christopher Redfern,* Transcript Excerpt of Sentencing Volume 1 (January 21, 2022) (Middle District of North Carolina, Case No. 1:20CR340-1), attached as **Exhibit 6.**

If the Court rejects Defendant Abdo's plain meaning argument above, then the rule of lenity should be applied here to preclude the Stafford Act enhancement in this case given the Department of Justice's numerous concessions of ambiguity at the *Redfern* sentencing.

F. Conclusion

The plain language of President Trump's Stafford Act declaration clearly demonstrates that the only Stafford Act benefits it authorized were partial reimbursements from FEMA for "Public Assistance emergency protective measures", not PPP loans from the Small Business Administration to private businesses such as the charged Count One and Count Two

8

loans. Consequently, this two level enhancement should not be applied here because the benefits from the Court One and Count Two PPP loans were not "paid in connection with... an emergency declaration" under the Stafford Act. Rather, they were paid "in connection with" the brand-new PPP program established by Congress which was not based on any Stafford Act presidential declaration. Alternatively, the Stafford Act enhancement should not be applied here under the rule of lenity.

## GROUNDS FOR DOWNWARD DEPARTURE AND DOWNWARD VARIANCE FROM THE ADVISORY SENTENCING GUIDELINES RANGE

The Probation Office has identified three grounds that could warrant a downward variance from the advisory Sentencing Guidelines range: "the defendant's unstable and traumatic upbringing to include physical and sexual abuse, his family ties and responsibilities, and his efforts to pay a significant portion of the restitution at the time of sentencing." PSI para. 103. A fourth ground is that Mr. Abdo acted out of panic just as the COVID pandemic shutdowns began to destroy his business.

### A. Joe Abdo's Efforts to Pay Off a Significant Portion of Restitution Owed

The Eleventh Circuit has held that "extraordinary restitution, whether paid before or after adjudication of guilt, may, in the unusual case, support a departure from the guidelines." *United States v. Kim,* 364 F.3d 1235, 1238

(11th Cir. 2004). Moreover, extraordinary restitution may also provide the basis for a variance from the Guideline range. *United States v. Pool,* 554 F.Supp.2d 1294, 1298 (N.D. Fla. 2008) (considering defendant's extraordinary restitution as both the basis for a departure from mandatory Guidelines and a variance from advisory Guidelines).

In *Kim,* the husband and wife defendants pled guilty to defrauding the WIC supplemental food program of $268,237 by using stolen WIC vouchers at their store. The defendants paid the full restitution amount by the sentencing hearing after obtaining loans from family and friends in Korea and the United States and paying the $25,000 balance from their savings account. Mr. Kim received a downward departure from the Guidelines range of 15-27 months to five years probation including six months of home detention. Mrs. Kim received a downward departure from a Guidelines range of 6-12 months to two years probation including four months of home detention. *Kim,* 364 F.3d at 1239. The Government appealed both sentences, but the Eleventh Circuit affirmed them both.

The *Kim* court held that "the proper inquiry" to determine whether a particular payment of restitution was extraordinary enough to warrant a downward <u>departure</u> was to examine "a wide range of factors, such as the degree of voluntariness, the efforts to which a defendant went to make

restitution, the percentage of funds restored, the timing of the restitution, and whether the defendant's motive demonstrates sincere remorse and acceptance of responsibility." *Id.* at 1244. The *Kim* panel was "impressed at the lengths to which Appellees went in obtaining the money to make restitution", including by "dipp[ing] significantly into their life savings and voluntarily under[taking] an enormous amount of debt, to wit, almost $200,000." *Id.* at 1245.

In this case, Joe Abdo and his wife Ashley Abdo sold their five bedroom house, moved their four daughters into a three bedroom apartment,[4] and transferred ***the entire proceeds*** of this sale of their primary asset totaling $220,464.01 to the trust account of Todd Foster Law Group for eventual use as restitution. In addition, Mr. Abdo raised an additional $175,000 for restitution by both borrowing $30,000 at 3 percent interest, as shown by **Exhibit 7**, and by selling half of his fishing business for $145,000, as shown by **Exhibit 8**.

Like the *Kim* defendants, Mr. Abdo "dipped significantly" into his (and his wife's) life savings by using 100 percent of the proceeds of his home sale to

---

[4] When Joe and Ashley Abdo sold their home on March 30, 2023, they moved from a five bedroom house where each of their four daughters had her own bedroom and the four girls shared two bathrooms into a three bedroom apartment in which the two older girls share one bedroom, the two younger girls share another bedroom, and all four girls share one bathroom. The Abdo's house also contained a dance space for practicing competitive dancing and a home office, neither of which are included in the Abdo's current apartment.

11

fund restitution in this case.[5] Knowing full well what Guidelines imprisonment range he is in, Mr. Abdo held nothing back from this sale for his wife and daughters and furthermore has raised the additional $175,000 without any guarantees that the combination will be deemed sufficient by the Department of Justice to satisfy his restitution obligation. This is the clearest and best evidence of the sincerity of Mr. Abdo's remorse.

Joe Abdo's actions demonstrate real remorse and a genuine effort to make amends.[6] Both Mr. Abdo and the Kims "are the rare defendants who demonstrated their extraordinary remorse and acceptance of responsibility by

---

[5] Mr. Abdo generated $220,646.01 in proceeds from the sale of his home. He further obtained a total of an additional $175,000 as a result of bringing in an new investor to purchase a 50 percent interest in his fishing business and obtaining a $30,000 loan. The total amount Mr. Abdo raised was therefore $395,464 ($220,464 + $175,000 = $395,464). With the approval of AUSAs Anita Cream, Jimmy Muench, and Jordan Howard, Mr. Abdo has used that $395,464 to pay the total forfeiture amount of $325,833 and to pay the remaining $69,167 as restitution. Pursuant to 28 U.S.C. § 22461(c), the Attorney General has statutory authority to "restore forfeited property to victims." That authority of the Attorney General is delegated to the chief of the Money Laundering and Asset Recovery Section (MLARS) of the DOJ Criminal Division in Washington by 28 C.F.R. § 9.1(b)(2). Therefore, as stated in Justice Manual 9-121.100, the chief of MLARS has discretionary authority to "authorize federally forfeited property or proceeds to be transferred to the court for use in satisfaction of orders of restitution entered at sentencing pursuant to 18 U.S.C. § 3363 et seq." AUSA Cream has requested authority from MLARS to restore $256,666 of the forfeiture proceeds paid by Mr. Abdo to be then paid as restitution to the victim Small Business Administration. If MLARS approves this request, then both Mr. Abdo's forfeiture and restitution obligations will be satisfied by the amounts Mr. Abdo prepaid prior to the sentencing hearing.

[6] Mr. Abdo's genuine remorse is also expressed in his letter to the Court, attached as **Exhibit 9,** and by the fact that he has repaid in full the Count Two loan, as demonstrated by the SBA loan summary attached as **Exhibit 10.**

making extraordinary restitution." *Id.* at 1245. For those reasons, Mr. Abdo deserves either a very significant downward departure or a very significant downward variance or some combination of both.

### B. Joe Abdo's Family Ties and Responsibilities

Joe Abdo's longstanding commitment to his family provides ample support for a downward variance here. *United States v. Gueverra*, 2023 WL 3304826, *1 (M.D. Fla., May 8, 2023) (Honeywell, J.) (departing downward from guidelines range of 108-135 months to 87 months based on defendant's "family ties and responsibilities, remorse, … and non-violent history"); *Gonzales v. United States*, 2014 WL 3396494, *4 (M.D. Fla., July 11, 2014) (Howard, J.) (noting downward variance from 262-327 months to 200 month based in part on defendant's "commitment to his family"); *United States v. Hester*, 627 Fed.Appx. 867, 871 (11th Cir. 2015) (unpublished and per curiam) (affirming sentence which included a variance from 262-327 months to 240 months based on defendant's history and family support); *United States v. Thomas*, 840 Fed.Appx. 858, 861 (11th Cir. 2021) (unpublished and per curiam) (affirming sentence which included a variance from career offender range based in part on family support).

Moreover, Joe Abdo's status as his family's sole breadwinner provides additional support for a downward variance. *United States v. Munoz-Nava*,

13

Case 8:23-cr-00388-TPB-CPT   Document 82-3   Filed 03/17/25   Page 15 of 20 PageID
Case 8:22-cr-00120-WFJ-UAM   Document 65   Filed 08/16/23   Page 14 of 19 PageID 363
1435

524 F.3d 1137, 1142-43 (10th Cir. 2008) (affirming downward variance in heroin case from Guidelines range of 46-57 months to a year and a day of imprisonment and one year of home detention where defendant was the sole support of his eight year-old son and his ailing and elderly parents).

### C. Joe Abdo's Unstable and Traumatic Upbringing

A defendant's "troubled childhood" and "extensive childhood trauma" support a downward variance. *United States v. Patterson,* 615 Fed.Appx. 594, 597 (11th Cir. 2015) (unpublished and per curiam) (affirming variance from 151-188 months to 120 months based in large part on defendant's "troubled childhood"); *United States v. Carter,* 506 F.Supp.3d 1204, 1213 (M.D. Ala. 2020) (granting downward variance from Guidelines range of 51-63 months to 33 months based on defendant's "extensive childhood trauma").

As discussed in PSI paragraphs 59-61, Joe Abdo had difficult relationships with both his largely absent father and his depressed, addicted, and verbally and physically abusive mother. Even more disturbing is the recurring sexual abuse Mr. Abdo suffered that is described in PSI paragraphs 60, 62, and 63. All of this repeated abuse Mr. Abdo suffered was made even more traumatic because it was committed either by a close family member or by friends of family members the young Joe Abdo trusted.

In the opinion of Licensed Clinical Social Worker Erin Grupp, who has treated Mr. Abdo non-continuously since 2012, "Joe Abdo suffers from three disorders: Post Traumatic Stress Disorder (PTSD) (ICD-10 code F43.12); Panic Disorder (ICD-10 code F41.0); and Attention-Deficit Hyperactivity Disorder (ADHD) predominately hyperactive type (ICD-10 code F90.1)." Ms. Grupp believes that these disorders, "particularly PTSD, are the result of his very traumatic childhood." **Declaration of Erin Grupp, LCSW attached as Exhibit 1.**

### D. Joe Abdo's Panic Motive and Diminished Moral Culpability

A defendant's motive is "relevant to the § 3553(a)(1) factor of 'the nature and circumstances of the offense and the history and characteristics of the defendant." *United States v. Oudomaine,* 57 F.4th 1262, 1268 (11th Cir. 2023). In addition, a defendant's "diminished moral culpability" may support a downward variance. *United States v. Knott,* 2022 WL 16571169, *8 (M.D. Ala., November 1, 2022) (granting downward variance for autistic defendant in child pornography case on grounds of diminished moral culpability).

A detailed analysis of the chronology of events leading up to Mr. Abdo's submission of the large Count One PPP loan for $305,000 in the evening of April 9, 2020 demonstrates convincingly that Joe Abdo, who suffers from panic disorder as diagnosed by LCSW Erin Grupps, in fact panicked when confronted

by the reality that his fishing business was about to collapse due to the spread of coronavirus and the associated COVID-19 shutdowns, including a shutdown of the restaurant industry that is the end user of the fish caught by Mr. Abdo's boats.

In April 2020, the primary buyer of fish caught by Joe Abdo's boats was a fish house named Fish Busterz operated by Charles Renier. **Declaration of Charles Renier attached as Exhibit 11.** In early April 2020, Mr. Renier told Joe Abdo that he would not be able to buy any more fish from him for the foreseeable future, possibly through the end of 2020. *Id.* Mr. Renier specifically advised Mr. Abdo to call in any of his boats that were in the Gulf fishing at that time because the demand for fish was plummeting. *Id.*

In early April 2020, one of Joe Abdo's boats named the Anthony C was at sea in the Gulf fishing under the command of Captain James Boday. **Declaration of James Boday attached as Exhibit 12.** On April 8, 2020, Joe Abdo sent a VMS text message to Captain Boday instructing him to return the Anthony C to port immediately. *Id.* Mr. Abdo explained that Charles Renier had told him that Renier would be ceasing buying fish due to restaurants shutting down because of COVID-19 lockdowns. *Id.* At the time Captain Boday received this VMS text message from Mr. Abdo, the Anthony C was about 20 hours offshore in the Gulf of Mexico. Consequently, the Anthony

C did not arrive in port until the following day, April 9, 2020, with about half the amount of fish normally caught on a typical trip. *Id.*

The National Oceanic and Atmospheric Administration (NOAA) Fisheries Landing Ledger report attached as **Exhibit 13** shows that the Anthony C landed 2,675 pounds of fish at 11:32 am on April 9, 2020. A little over 7 hours later, Mr. Abdo filed the Count One $305,000 PPP loan application around 6:50 pm. **Exhibit 14.**

The declarations of Charles Renier and Captain James Boday convey a sense of the panic and desperation felt by people, including Joe Abdo, whose personal financial survival was at severe risk by April 9, 2020 -- due to a worldwide pandemic whose effects were beyond the control of anyone.

Joe Abdo acted out of panic. That is not a defense, but it does diminish his moral culpability. Mr. Abdo acted to protect his family as his source of income was literally drying up, not to buy a Lamborghini. Mr. Abdo deserves a downward variance to reflect his diminished moral culpability.

## CONCLUSION

Based on all the departure and variance arguments above, Defendant Abdo requests a non-incarcerative sentence like these imposed and affirmed in the *Kim* case. Mr. Abdo panicked as his livelihood was evaporating during a global pandemic. Since then, Mr. Abdo has expressed his sincere remorse by

selling his family's house, selling half his fishing business, and incurring a substantial debt to pre-pay what should be his entire restitution and forfeiture obligations.

Imposing a non-incarcerative sentence would punish Mr. Abdo for his criminal conduct while allowing Mr. Abdo to continue providing for his family and to continue his ongoing mental health therapy. **Exhibit 15.** [7]

Dated: August 16, 2023

Respectfully submitted,

*/s/ Kevin Darken*
**TODD FOSTER**
Florida Bar No.: 0325198
tfoster@tfosterlawgroup.com
**KEVIN DARKEN**
Florida Bar No.: 90956
kdarken@tfosterlawgroup.com
**MELISSA SNYDER**
Florida Bar No.: 1025759
msnyder@tfosterlawgroup.com
**TODD FOSTER LAW GROUP, PLLC**
601 Bayshore Blvd. Suite 615
Tampa, FL 33606
Telephone: (813) 565-0600
*Attorneys for the Defendant*

---

[7] In her letter dated August 1, 2023, LCSW Ann DePoole states that she has been treating Mr. Abdo consistently since April 2022, that Mr. Abdo "has made significant progress working on his mental health issues" and that "Mr. Abdo would benefit from continued outpatient therapy."

18

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 16, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all parties indicated on the electronic filing receipt.

/s/ Kevin Darken<br>
<b>KEVIN DARKEN</b>